Not for Publication

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

ROBERT MELBER,

      *Plaintiff,*

      v.

UNITED STATES OF AMERICA,

      *Defendant.*

Civil Action No. 11-3510

**OPINION**

**John Michael Vazquez, U.S.D.J.**

This Federal Tort Claims Act (the "FTCA") case arises out of Plaintiff Robert Melber's ophthalmologic care while a patient of the Department of Veterans Affairs New Jersey Health Care System (the "VA"). Plaintiff filed the instant action in New Jersey state court against Neelakshi Bhagat, M.D.; Keegan Johnson, M.D.; Scott M. Walsman, M.D.; Amir Cohen, M.D.; Jung S. Lee, M.D., and John Doe Defendants. At the time of the relevant events, Drs. Johnson, Walsman, and Lee were employed by the VA. On June 17, 2011, the United States substituted itself as the Defendant for the three physicians and removed the matter to this Court. *See* Amended Notice of Removal and Substitution of Defendant ¶¶ 2, 5; D.E. 2. Drs. Bhagat and Cohen, who were not federal employees at the time in question, were dismissed from this action on March 28, 2012. D.E. 31. Thus, the United States is the sole Defendant.

Claims asserted pursuant to the FTCA are tried without a jury. *See* 28 U.S.C. § 2402. Accordingly, there was a five-day bench trial between April 1 and 10, 2019. The trial consisted of witness testimony and exhibits; the parties also had a full opportunity to examine and cross-examine the witnesses as well as present their arguments. After consideration of the record, the

following are the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## I.     FINDINGS OF FACT[1]

This medical malpractice matter focuses on retained lens material in Melber's right eye following cataract surgery. Colloquially, the human eye is divided into two sections: the anterior segment, which is the front of the eye, and the posterior segment, which is the back of the eye. The anterior segment includes the iris; lens; cornea, which is a transparent covering over the iris and lens; and the visible white section of the eyeball, called the sclera. Tr. Vol. 3 at 247:22-248:17. The lens consists of two major components. Nuclear lens material, found in the center of the lens, is hard and looks yellowish. The remainder of the lens is called the cortex. Cortical material is softer and looks white. *Id.* at 273:13-17.

The posterior section of the eye is filled with a jelly-like substance called vitreous. *Id.* at 248:18-25. The posterior section also consists of a very thin membrane called the retina, which lines the interior of the eye. The retina is analogous to film in a camera; images are projected through the lens onto the retina and that information is then transferred to the brain through the optic nerve. The macula is the small, center portion of the retina. The macula is the part of the retina that allows a person to see details and clearly. *Id.* at 249:7-15. The fovea, in turn, is at the center of the macula. Tr. Vol. 2 at 151:16-19.

Here, Melber suffered a macula-off detached retina in his right eye. After his retina surgery, Melber developed a cataract. Melber then had a second surgery to remove the cataract,

---

[1] The underlying facts are largely not in dispute. Instead, the parties' contest the proper inferences to be drawn from those facts.

and following that surgery, lens material remained in Melber's right eye. The retained lens material, and its impact on Melber's vision, is the central focus of this case.

## A. Stipulated Facts

The following undisputed facts were set forth in the stipulation of facts section of the Final Pretrial Order ("Stipulated Facts"), D.E. 108. Plaintiff Robert Melber, a Navy veteran, was a patient of the VA for many years. Stipulated Facts ¶ 1. Melber began noticing symptoms of blurred vision in his right eye on May 2, 2009, and went to the VA's non-urgent clinic for treatment on May 4. *Id.* ¶¶ 2-3. On May 5, 2009, Plaintiff was seen by Drs. Jung S. Lee, M.D., and Scott Walsman, M.D., at the VA Ophthalmology Clinic. During the appointment, Melber stated that he could not see out of his right eye and his visual acuity for the right eye was measured at "counting fingers."[2] *Id.* ¶ 4. Melber's visual acuity for his left eye was 20/20. *Id.* Melber was diagnosed with a chronic retinal detachment in the right eye, which had progressed to involve the macula. Melber also had mild cataracts in both eyes. At this appointment, Dr. Lee explained to Melber that surgery to repair his detached retina may not improve the vision in his right eye because the macula was detached. *Id.*

On May 11, 2009, Melber met with Dr. Neelakshi Bhagat, M.D., and resident Dr. Keegan Johnson, M.D., at the VA. *Id.* ¶ 5. Dr. Bhagat explained the benefits and risks of surgery to repair the detached retina, including a decrease in vision, the need for repeated surgery, and the progression of cataracts. Understanding the risks, Melber decided to have the surgery. *Id.* Drs.

---

[2] Visual acuity, as explained during the trial, refers to the clarity of vision. Most commonly, acuity is tested through an eye chart. 20/20 vision means that the person can clearly see the eighth line of the chart from twenty feet. 20/200 vision means that the person can only see the top line of the chart, which is commonly a large "E." Tr. Vol. 2 at 156:22-157:4. When a person's vision cannot be calculated by reference to the eye chart, physicians determine whether the person can "count fingers," *i.e.* the physician's fingers, and at what distance, such as 2 or 5 feet. When a person's visual acuity is counting fingers, his acuity is worse than 20/200.

Bhagat and Johnson performed the surgery the same day. Intraoperatively, Drs. Bhagat and Johnson again diagnosed Melber with a macula-off retinal detachment in the right eye in addition to a retinal tear. *Id.* There were no complications during the surgery, and Melber was in stable condition and discharged following the procedure. *Id.*

Dr. Amir Cohen, M.D., examined Melber in the VA Ophthalmology clinic the following day, May 12, 2009. *Id.* ¶ 6. Melber's vision in his right eye was limited to hand motions (which is worse than counting fingers), and Dr. Cohen noted that Melber's cataract had worsened. *Id.* Melber had additional post-operative appointments on May 13 and 14, 2009. *Id.* ¶¶ 7-8. On the May 13 visit, the examining doctors confirmed that Melber's retina had successfully been reattached during surgery. *Id.* On May 14, 2009, a B-scan ultrasound of the right eye "showed findings consistent of a progressive cataract." *Id.* On both days, however, Melber's vision remained at hand motions, and the pressure in his right eye was low. *Id.* Drs. Bhagat and Walsman examined Melber at the VA Eye clinic on May 18, 2009. Melber's vision remained at hand motions, and he still had low intraocular pressure. *Id.* ¶ 9. Drs. Bhagat and Walsman performed another B-scan ultrasound, which showed choroidal detachment. *Id.*

Melber was then scheduled for a second surgery on his right eye: a cataract extraction[3] and placement of a sulcus intraocular lens. *Id.* On June 8, 2009, Drs. Cohen and Walsman performed the surgery. *Id.* ¶ 11. On June 9, 2009, one day after the cataract surgery, Drs. Cohen and Walsman examined Melber. "It was noted that [Melber] had a small amount of retained cortical lens material in the right eye."[4] *Id.* ¶ 12. Dr. Walsman examined Melber during a follow-

---

[3] The parties agree that the development, or worsening, of a cataract is common complication of retina surgery.

[4] The parties do not appear to dispute that nuclear, rather than solely cortical, lens material was actually in Melber's right eye following the second surgery. Dr. Cohen indicated that when

up visit on June 12, 2009, and again noted a small amount of retained cortical material in Melber's right eye. *Id.* ¶ 14. On June 19, 2009, Drs. Lee and Walsman examined Melber during a follow-up visit at the VA Ophthalmology Clinic. During this visit, Drs. Lee and Walsman noted that the retina was attached but there was a decreased view of the posterior section of Melber's right eye due to corneal swelling. *Id.* ¶ 15. Drs. Lee and Walsman also saw a small amount of retained cortical material. *Id.* "The recommendation was to allow time to clear the inflammation and to schedule a follow-up visit in two [to] three weeks to allow time for corneal swelling to resolve and allow improved visualization of the retina." *Id.*

On July 20, 2009, Melber had a follow-up appointment with Dr. Bhagat. At this time, Melber's visual acuity had improved and was approximately 20/200 in the right eye. *Id.* ¶ 16. During her examination, Dr. Bhagat saw an "[i]nferiorly dislocated large cataract piece." *Id.* Dr. Bhagat noted that the retained cataract fragment "?? Looks nuclear + cortical." *Id.* Dr. Bhagat also indicated that there was mild vitreal inflammation. *Id.* Dr. Bhagat wrote that Melber should follow up in one month, and "if still unchanged, [he] may need to consider PPV/PPL (surgical procedures to remove cataract fragment)". *Id.*

Dr. Lee saw Melber at a follow-up appointment on August 3, 2009. Melber's visual acuity was measured at 20/200[5] and during his examination, and Dr. Lee confirmed that the retained lens material was still in Melber's right eye. Dr. Lee noted that the retina was flat (meaning in place)

_____

performing the cataract surgery, it appeared that the nucleus of the lens had liquified, meaning that it did not have to be removed because it was no longer present in solid form. No other medical expert supported this view.

[5] Although the parties stipulated to the fact that the visual acuity in Melber's right eye was 20/200 on August 3 the trial testimony reflects otherwise. And as will be discussed, Melber's visual acuity on August 3 is a key piece of evidence in this trial. As a result, the Court notes that according to the trial testimony and record evidence, Melber's visual acuity was measured at counting fingers and his pinhole acuity was 20/400.

and diagnosed Melber as having an epiretinal membrane in his right eye. *Id.* ¶ 17. Dr. Lee recommended that Melber return for a follow-up visit on August 17, 2009. *Id.*

Melber did not follow-up with any doctor at the VA. Instead, on August 24, 2009, Melber saw Dr. Michael Harris, M.D., a private ophthalmologist with Retina Associates of N.J., P.A. *Id.* ¶ 18. Dr. Harris examined Melber and determined that there were "retained nucleus fragments" in his right eye, an epiretinal membrane, and "evidence of macular edema associated with the retained lens material." *Id.* ¶ 18. Edema refers to swelling. Dr. Harris recommended removal of the retained lens material "in hopes of eliminating the edema" but noted that "the amount of visual recovery will be limited due to the fact that the retinal detachment has been present for several weeks prior to its surgical repair." *Id.* Approximately three weeks later, on September 16, 2009, Dr. Harris performed Pars Plana Vitrectomy/Lensectomy ("PPV/PPL") surgery on Melber's right eye to remove the retained lens material and the epiretinal membrane. *Id.* ¶ 19.

At a post-operative follow-up with Dr. Harris on September 21, 2009, Melber's visual acuity was measured at 20/150. *Id.* ¶ 21. Melber, however, still had macular edema in his right eye. *Id.* On October 5, 2009, Melber's visual acuity had worsened and was measured at 20/400. In addition, the macular edema was still present. *Id.* ¶ 22. Melber's condition was unchanged at an October 19, 2009 appointment. *Id.* ¶ 23. At a November 16, 2009 appointment, Melber's visual acuity had improved to 20/150. The macular edema had also improved. *Id.* ¶ 24.

Melber continued to be treated by Dr. Harris' practice over the next several years. Melber received periodic steroidal injections and, at times, his vision in the right eye and the macular edema appeared to improve. For example, at a January 4, 2010 appointment with Dr. Harris, Melber's visual acuity was "stabilized at 20/800 in the right eye." *Id.* ¶ 28. In addition, Dr. Harris noted that there was "a mild amount of edema" but it was "not severe enough to explain the acuity."

*Id.* Dr. Harris indicated that Melber's vision loss "was more related to damage from the original retinal detachment, rather than the macular edema." *Id.* On September 13, 2010, Dr. Harris found no evidence of macular edema and Melber's vision in his right eye was measured at 20/150. *Id.* ¶ 35.

Despite these periodic improvements, the overall condition of Melber's right eye ultimately worsened. On December 13, 2010, Melber's visual acuity was measured at 20/400 and Dr. Harris "found that the right eye macular edema had returned along with a prominent epiretinal membrane." *Id.* ¶ 37. At a February 14, 2011 appointment, Dr. Harris determined that Melber continued to have macular edema in the right eye with vision at finger counting at five feet. *Id.* ¶ 39. On May 23, 2011, Dr. Harris found that in addition to the epiretinal membrane, Melber's right eye had subretinal fluid beneath the right fovea along with intraretinal cystic edema. *Id.* ¶ 40. On September 22, 2014, Melber's visual acuity was counting fingers at three feet in his right eye and 20/20 in the left eye. *Id.* ¶ 45. During an examination, Dr. Harris noted evidence of recurrent epiretinal member and macular edema in the right eye. Dr. Harris noted that Melber's "right eye vision has been at this level for many years and no additional treatment is required at this point." *Id.*

## B. Trial Testimony

At trial, the Court heard testimony from the following witnesses: Robert Melber; Michael Melber, Plaintiff's son; Dr. Harris (by way of video deposition), a vitreoretinal surgeon and Plaintiff's treating physician after the VA; Dr. Harvey Rosenblum, a general ophthalmology and anterior segment surgery specialist and Plaintiff's liability expert; Dr. Bhagat, a vitreoretinal surgeon and one of Plaintiff's treating physicians at the VA; Dr. Cohen, a glaucoma specialist and one of Plaintiff's treating physicians at the VA; Dr. Lee, the head of ophthalmology at the VA

during the events at issue, an anterior segment surgery specialist, and one of Plaintiff's treating physicians at the VA; and Dr. Mitchell S. Fineman, a vitreoretinal surgeon and Defendant's liability expert.

Plaintiff testified first. Melber is retired and a veteran of the United States Navy. He served for approximately one year and was discharged in 1960 due to a medical condition. Tr. Vol. 1 at 33:23-24:12. At his deposition, Melber indicated that he was discharged because of paresthesia of the right lower mandible. At trial, however, Melber added that his discharge was also due to falling arches. *Id.* at 98:6-22. Melber received medical disability upon discharge, which he continues to receive to this day. *Id.* at 35:10-14.

At trial, Melber's testimony was at times materially different from the parties' stipulated facts and his deposition testimony. First, as indicated above, in the Final Pretrial Order, the parties stipulated that Melber first experienced blurred vision on May 2, 2009 and was seen at the non-urgent clinic at the VA for his poor vision on May 4, 2009. Stipulated Facts ¶¶ 2-3. The following day, May 5, 2009, Melber met with Drs. Lee and Walsman in the VA Ophthalmology Clinic. *Id.* ¶ 4. At trial, Melber insisted that he first suffered blurred vision on April 27, 2009 (Tr. Vol. 1 at 53:2-5) and that he saw Dr. Walsman in VA Ophthalmology Clinic that same day (*id.* at 55:7-24; 56:22-57:3). The Court credits Melber's trial testimony regarding when he began noticing symptoms of the detached retina but not his statements that he was examined by Dr. Walsman on April 27. The record evidence indicates that Melber was not seen in the Ophthalmology Clinic until May 5, 2009, as the parties previously stipulated. *See* Ex. A; Stipulated Facts ¶ 4.

In addition, at his deposition, Melber stated that he did not meet with any VA doctor on August 3, 2009, and that no follow-up appointment at the VA was scheduled after the August 3 appointment. Tr. Vol. 1 at 76:12-77:25. At trial, however, Melber explained that he did meet with

Dr. Lee on August 3 and that during this appointment, Dr. Lee told him to come back to the VA in two weeks for a follow-up. *Id.* at 45:10-17; 78:13-79:1. Instead of returning the VA, Melber decided to seek a second opinion from a doctor outside of the VA. *Id.* at 46:21-47:3. Again, Melber's trial testimony contradicts earlier statements made during his deposition, and the Court credits Melber's trial testimony as it is also consistent with the record evidence.

After his August 3 appointment at the VA, Melber testified that he attempted to meet a Dr. Higgins at Belleville Hospital the same day but was unsuccessful. *Id.* at 47:2-5. Approximately two weeks later, Melber went to a Dr. Marone in North Arlington, New Jersey. Dr. Marone examined Melber and told Melber that the "large piece" needed to "come out" but that Dr. Marone was not to correct person to perform the surgery. *Id.* at 47:8-49:3. On August 24, 2009, Melber met with Dr. Harris. *Id.* at 48:22-49:5. Dr. Harris treated Melber for multiple years. Melber testified that he has been a patient of Dr. Harris for ten years (*id.* at 49:24-25), although the Court notes that Melber's first appointment with Dr. Harris was in 2009 so the ten-year anniversary has not yet occurred.

Melber stated that he now has permanent vision loss in his right eye. Melber testified that with his right eye he can see light, "but it's a blur," and that he can see his hand if he holds it close to his face. *Id.* at 50:7-12. Melber explained that since 2009, he can no longer read or drive, perform many household tasks, and that going up and down stairs is difficult. *Id.* at 51:7-25. As a result of his vision loss, Melber testified that he has to rely on his adult son daily to perform essentially all household tasks and drive Melber as needed. *Id.* at 50:21-51:2. The Court also heard testimony from Melber's son Michael regarding the limitations Plaintiff now faces because of the vision loss in Plaintiff's right eye.

The remaining testimony came from multiple medical professionals. Every doctor that testified is board certified in ophthalmology. There are sub-specialties of ophthalmology although none are recognized for board certification purposes. Generally, the ophthalmologists who testified specialized in either the anterior, *i.e.* front, or posterior, *i.e.* the back, of the eye. Drs. Harris, Bhagat, and Fineman are vitreoretinal surgery specialists, which pertains to the posterior of the eye. Drs. Rosenblum, Cohen and Lee, focus on the anterior segment of the eye.

The nuclear retained lens material in Melber's right eye is at the heart of this case. Retained lens material or fragments ("RLF") refers to material that remains in the vitreous of the eye following cataract surgery. The parties agreed that cortical material, at least if it is not too large, most often does not require surgical removal because it will naturally reabsorb into the body. The parties also agreed that nuclear material, at least if it is sufficiently large, must be removed surgically because it will not reabsorb into the body. A nuclear RLF can lead to inflammation, which in turn, can lead to macular edema.[6] Macular edema is leakage from blood vessels in the retina that accumulates in the macula and causes swelling. Macular edema can lead to the loss of visual acuity.

The disagreement in this case is *when* the standard of care called for the nuclear RLF to be removed. A related issue is whether Defendant violated the standard of care by not conducting certain tests on August 3, 2009, that would have confirmed the size and type of the RLF in Melber's right eye. The pertinent views and opinions of the medical professionals are discussed in the analysis section below.

---

[6] The medical professionals also all appear to agree that surgery to repair a macular-off retinal detachment alone can cause macular edema, and that cataract surgery alone can cause macular edema.

## II.   CONCLUSIONS OF LAW

### A.  Applicable Law

As discussed, this matter is governed by the FTCA, which "provides a mechanism for bringing a state law tort action against the federal government in federal court." *Lomando v. United States*, 667 F.3d 363, 372 (3d Cir. 2011). Under the FTCA, the United States may be liable "for the tortious actions of its employees." *Id.* at 374. Specifically, the United States is responsible for injuries caused by the "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his [federal] employment." 28 U.S.C. § 1346(b)(1); § 2679(a). Here, Plaintiff interacted with multiple doctors at the VA but Drs. Bhagat and Cohen were contractors at the VA Medical Center in East Orange. Tr. Vol. 3 at 250:24-251:7; 353:20-25. Only Drs. Lee, Walsman, and Johnson were VA employees in 2009, when the events giving rise to this matter occurred. Consequently, the United States is only responsible for the conduct of Drs. Lee, Walsman, and Johnson. *Lomando*, 667 F.3d at 374.

In addition, the United States is only liable under the FTCA "to the extent that a private employer would be liable in similar circumstances in the same locality." *Lomando*, 667 F.3d at 373 (citing 28 U.S.C. § 1346(b)(1)). Thus, the law of the place where the act or omission occurred sets the standard for liability. 28 U.S.C. § 1346(b). Because the acts here occurred in New Jersey, New Jersey substantive law applies. *Lomando*, 667 F.3d at 373. Accordingly, to prevail against the United States, Plaintiff must prove the elements of a medical-malpractice claim under New Jersey substantive law.

A claim for medical malpractice "is a kind of tort action in which the traditional negligence elements are refined to reflect the professional setting of a physician-patient relationship." *Verdicchio v. Ricca*, 179 N.J. 1, 23 (2004). Pursuant to New Jersey law, a plaintiff "must prove

the applicable standard of care; that a deviation has occurred; and that the deviation proximately caused the injury." *Id.* Moreover, a plaintiff usually must present expert testimony to prove each element of a medical malpractice claim. *Medina v. Pitta*, 442 N.J. Super. 1, 25 (App. Div. 2015).

## B. Deviation from the Standard of Care and Proximate Cause

Plaintiff argues that Dr. Lee deviated from the standard of care on August 3, 2009 and that this deviation proximately caused Plaintiff's injuries. Plaintiff also contends that Dr. Harris acted appropriately and did not breach any standards of care on August 24, 2009 or anytime thereafter. As a result, the relevant time frame for Defendant's liability is limited to August 3 through August 23 – meaning that Plaintiff's theory of the case is that Defendant should have performed appropriate tests and performed surgery to remove the RLF within this approximately three-week period. Defendant contends that the actual time frame is August 3 to August 17, 2009, when Plaintiff voluntarily missed his follow-up appointment at the VA. Although Defendant makes a fair point, whether the end-date for liability is August 17 or August 23 does not change the Court's analysis.

### 1. Plaintiff's Proof of Liability and Proximate Cause

The Court first reviews Plaintiff's case-in-chief, specifically, the testimony of Drs. Rosenblum and Harris. Plaintiff argues that the applicable standard of care here dictates that a large, nuclear RLF must be surgically removed because it will not reabsorb into the eye. Again, the United States does not dispute this point. Instead, the critical question is when such material needed to be removed in light of Melber's condition.

Dr. Rosenblum, Plaintiff's liability expert, opined that Defendant breached the standard of care on August 3 because Dr. Lee should have scheduled surgery on this date. Tr. Vol. 2 at 170:14-

25.  Dr. Rosenblum's opinion assumes that "significant" macular edema[7] had developed in Melber's right eye and was "well established" by August 3. *Id.* at 172:5-8; 195:2-7. When asked how quickly surgery should occur once macular edema is recognized, Dr. Rosenblum said that "there's a range of dates" when surgery would be appropriate but that it is "a judgment call based on the previous history." *Id.* at 195:8-15. Dr. Rosenblum continued that here, surgery should have been performed days, not weeks or months, after August 3. *Id.* 195:11-13. Dr. Rosenblum added that the ultimate decision as to when surgery should occur is left to a posterior segment surgeon (such as Dr. Harris, Dr. Bhagat, or Dr. Fineman). *Id.* at 192:20-193:3. Thus, viewing Plaintiff's evidence generously, Plaintiff established through expert testimony that the applicable standard of care requires that once macular edema is diagnosed by an anterior segment surgeon, RLF must be removed within a matter of days.

Dr. Rosenblum, however, failed to adequately explain how or if Melber's right eye would have improved had surgery been scheduled on August 3 or shortly thereafter. Rather, Dr. Rosenblum only generally opined that "had the surgical intervention been accomplished earlier, that a significant amount of vision in approximately the range of 20/200 would have been retained in the long term." *Id.* at 217:5-10. But it is entirely unclear what constitutes "earlier" in Dr. Rosenblum's opinion. As noted, Plaintiff's theory of the case is that the surgery to remove the RLF should have occurred on or after August 3 but before August 24, when Dr. Harris saw Melber. In other words, Plaintiff needed to produce evidence that, within a reasonable degree of medical certainty, if Plaintiff had the necessary surgery on or after August 3 but before August 24,

---

[7] Dr. Rosenblum's opinion that macular edema had developed by August 3 was based on his review of the medical records on that day when compared with the records on July 20. This comparison, along with the other medical opinions concerning the difference between July 20 and August 3, are discussed below.

Plaintiff's visual acuity in his right eye would be better than it currently is. Yet, Plaintiff's proofs in this regard were ambiguous as Dr. Rosenblum never addressed the August 23 end date.

More importantly, Dr. Rosenblum's expert testimony is undermined by the testimony of Dr. Harris, who was "the best witness in the entire case" according to Plaintiff's counsel.[8] Tr. Vol. 5 at 675:9-11. As noted, Dr. Harris was Plaintiff's treating physician for a number of years beginning in August 2009, and Plaintiff relied on Harris at trial. When asked why he did not schedule emergency surgery after examining Plaintiff on August 24, Dr. Harris replied that by that date, damage from the macular edema had already occurred. Dr. Harris testified as follows:

> [A]t that point, [the RLF] had already been in the eye for three months, so a delay of another two weeks I don't think would make a substantial difference. Had we been able to remove it *within the first couple weeks after his cataract surgery*, I think we may have made a difference.

Harris Dep. at 111:15-20 (emphasis added). Dr. Harris added that the length of time that RLF remains in the eye, as opposed to the size of the fragments, is critical. Dr. Harris stated that "[t]he longer that the lens material is in the eye the more likely the edema will be recalcitrant to therapy." *Id.* at 111:4-7.

As discussed, Plaintiff's cataract surgery occurred on June 8. Stipulated Facts ¶ 11. This means that conservatively, according to Dr. Harris, Melber should have had surgery to remove the RLF by the end of June. But Dr. Rosenblum opined that Defendant did not breach the standard of

---

[8] At closing, Plaintiff's counsel explained that Dr. Harris' testimony was not offered to establish the applicable standard of care. Instead, as Plaintiff's treating physician, Dr. Harris was presented to discuss Plaintiff's injury, diagnosis, and prognosis. Tr. Vol. 5 at 673:11-23. Although Dr. Harris was qualified as an expert, the Court accepts Plaintiff's representation. But as discussed, Dr. Harris' treatment of Plaintiff and his testimony undercuts Plaintiff's case as to the applicable standard of care and highlights the fact that Plaintiff does not establish proximate cause through expert testimony. Again, in this section, the Court is merely focusing on Plaintiff's case-in-chief without consideration of Defendant's evidence.

care until August 3, approximately one month later. Thus, if the Court credits Dr. Harris' testimony then by definition, Dr. Rosenblum's expert testimony fails to establish proximate cause because even if there was a deviation on August 3, it did not cause Melber's injuries as any damage from the RLF had already occurred. Thus, based on the critical, conflicting evidence of Plaintiff's case-in-chief, the Court finds that Plaintiff has not carried his burden.

In sum, the Court finds that Plaintiff failed to carry his burden of establishing proximate cause.

### 2. Alternate Finding as to Liability and Proximate Cause

Alternately, the Court finds that Defendant's evidence as to the standard of care, deviation therefrom, and proximate cause is more credible.

When RLF is present, "the cornea needs to be sufficiently clear such that surgery [to remove the fragments] can be performed and the lens material removed safely." Harris Dep. at 113:18-24. But after eye surgery, regardless of whether there is RLF, the cornea can be hazy or cloudy which makes it difficult for a doctor to see into the eye. *Id.* at 112:14-113:7. Here, the VA records note that Melber had corneal edema, or swelling, following his June 8 glaucoma surgery. *See* Exhibit A at 55 (June 9 progress report); 53 (June 19 progress report). Drs. Cohen and Walsman identified retained cortical material during these appointments but noted that there was a decreased view to the posterior section of Melber's eye due to the cornea. *Id.*

The view into Melber's cornea did not clear until his appointment with Dr. Bhagat on July 20. At this appointment, Melber's visual acuity was measured at 20/200 and it did not change when corrected with a pinhole. *Id.* at 49. A pinhole is a rudimentary way to correct refractive errors; it "is the measure of one's corrected vision." Harris Dep. at 72:6-7; 73:1-2. Pinhole acuity takes away extraneous issues caused by the cornea or lens and measures what the retina can see as

if the cornea and lens did not exist. Tr. Vol. 4 at 545:18-546:5. A pinhole test corrects for corneal swelling. Tr. Vol. 3 at 283:6-10. In other words, the pinhole exam is a better test of a person's visual acuity vis-à-vis the retina.

During her exam on July 20, Dr. Bhagat saw a large, inferiorly located RLF that "?? looks nuclear + cortical." Ex. A at 51. Dr. Bhagat testified that her notation "?? Looks nuclear" meant "the possibility there may be a nuclear component" to the RLF and "+ cortical" means that the material was "definitely cortical." Tr. Vol. 3 at 286:14-17. In addition, Dr. Bhagat indicated that there was "mild vitreal inflammation" in Plaintiff's right eye. Ex. A at 51. Dr. Bhagat also did not see any signs of macular edema. Tr. Vol. 3 at 298:11-16. She noted that the fundus was flat and that a foveal light reflex ("FLR") was present in Melber's right eye. *Id.* at 339:2-3. Flat is a positive indication, meaning that the reattachment of the retina was successful. As to the FLR, the fovea is the center of the macula, as noted above. The testifying medical professionals appeared to agree that macular edema is not present if there is an FLR. *See, e.g.*, Tr. Vol. 4 at 546:20-25; *see also* Tr. Vol. 2 at 189:12-14. Thus, as of July 20, there was not macular edema in Melber's right eye.

Dr. Bhagat continued that even if she had observed signs of macular edema on July 20, it would not be an indication for emergency surgery. In her opinion, if macular edema was present, surgery could have occurred in the next two to three weeks. Tr. Vol. 3 at 298:22-25. Finally, the July 20 progress note states that Melber should follow-up within one month, and "if still unchange[d], may need to consider PPV/PPL." Ex. A at 51. The PPV/PPL are surgical procedures (ultimately performed by Dr. Harris) to remove RLF. Dr. Bhagat explained that at the one-month follow-up she would have examined Melber, and if the RLF "still seemed pretty big and [she] did

not think that the body had started to absorb the particles in the intervening month . . . [she] most likely would have scheduled surgery." Tr. Vol. 3 at 297:22-298:5.

Melber returned to the VA Ophthalmology clinic for an appointment on August 3 and met with Dr. Lee. At this appointment, Melber's visual acuity for the right eye was measured at counting fingers but when corrected with a pinhole, measured at 20/400. Ex. A at 47. Dr. Lee explained that the change from 20/200, Melber's visual acuity on July 20, to the pinhole visual acuity of 20/400 on August 3 amounted to a one-line difference on an eye chart. Tr. Vol. 4 at 504:13-16. As noted, the pinhole exam provides a better indication of visual acuity as to the retina. During the slit lap exam, Dr. Lee observed superficial punctate keratitis ("SPK") on the right cornea. *Id.* at 465:5-10; Ex. A at 47. SPK is a sign that the cornea is irritated, and in Dr. Lee's opinion, was most likely caused by medication. Tr. Vol 4 at 465:11-17. SPK can lower a patient's visual acuity. *Id.* at 465:18-20. In addition, Dr. Lee determined that Melber had very low pressure in his right eye.[9] *Id.* at 464:11-24; Ex. A at 47. Low pressure "can blur the vision and cause a decrease in vision." Tr. Vol. 4 at 465:1-4. Dr. Lee also diagnosed Melber with having an epiretinal membrane, which is a thin film that develops over the retina. *Id.* at 465:24-466:14; Ex. A at 48. An epiretinal membrane can also distort a patient's vision. Tr. Vol. 4 at 466:10-14. Finally, Dr. Lee noted that during his exam he had a decreased view to the posterior segment of the eye, Ex. A at 48, which was likely caused by the SPK, Tr. Vol. 4 at 550:17-19.

Dr. Rosenblum opined that the standard of care dictates that because of the change in Melber's visual acuity on August 3 (from July 20), Dr. Lee should have performed diagnostic tests to detect the presence of macular edema as well as to determine the size and type of the RLF. Tr.

---

[9] Because Melber's eye pressure was so low, Dr. Lee instructed Melber to stop taking Cosopt, a medication that is used to lower eye pressure. Dr. Lee determined that the Cosopt "was working too well" in this case Tr. Vol. 4 at 464:18-24.

Vol. 2 at 172:6-23. Dr. Rosenblum testified that Dr. Lee should have performed a fluorescein angiogram or an ocular coherence tomography ("OCT") scan to figure out why there was a "substantial" drop in visual acuity between July 20 and August 3. Tr. Vol. 2 at 165:9-166:12. An OCT scan, which appears to be a minimally invasive test, results in a photograph of the cross section of the macula and indicates whether there is swelling. *Id.* at 165:21-24. A fluorescein angiogram can show if there is leakage from blood vessels in the eye. *Id.* at 166:5-12.[10] While not explained in detail, Dr. Rosenblum appeared to opine that had an OCT scan or angiogram been performed on August 3, macular edema would have been detected. Had macular edema been detected, Dr. Rosenblum seemed to indicate, Dr. Lee would have known to schedule Plaintiff's PPV/PPL surgery. The Court discusses this testimony, and Defendant's evidence in response, below.

Using the uncorrected visual acuity measurements, Dr. Rosenblum determined that Melber had a "substantial" or "dramatic" change in visual acuity from July 20 to August 3. *Id.* at 164:13-15; 165:1-2. Uncorrected, Melber's visual acuity dropped from 20/200 to counting fingers. *Compare* Ex. A at 49 *with* Ex. A at 47. Dr. Rosenblum testified that in light of this dramatic change, Dr. Lee should have performed a fluorescein angiogram or OCT scan to ascertain why the change occurred. Tr. Vol. 2 at 165:9-166:12. Thus, according to Dr. Rosenblum, Dr. Lee's failure to perform the diagnostic tests led to a delay in identifying the macular edema and in removing the

---

[10] To perform a fluorescein angiogram, fluorescein dye is injected into the patient's arm. The dye enters the blood stream and travels to blood vessels located in the back of the patient's eye. As this occurs, a technician takes photographs of the eye using a camera with a special filter. From the photographs, an ophthalmologist can see the flow of the dye through the blood vessels in the retina. A fluorescein angiogram will show if blood vessels in the retina are abnormal or leaking. Harris Dep. at 19:20-20:6.

RLF. Dr. Rosenblum opined that this delay "was the proximate cause for ongoing macular edema and eventually permanent loss of vision in [Melber's] right eye." *Id.* at 174:1-7.

Dr. Rosenblum vigorously pointed to the drop in visual acuity between July 20 and August 3 as proof that macular edema developed in Melber's right eye during this time.[11] As discussed, Dr. Rosenblum used Plaintiff's uncorrected visual acuity rather than his pinhole acuity on August 3. The Court, however, credits Dr. Fineman's testimony that pinhole acuity was a more accurate assessment because it provided the best information as to visual acuity vis-à-vis the retina, which is what macular edema would have impacted. Dr. Harris also explained that pinhole acuity is often a better measurement tool because it gives an estimate of a patient's best corrected vision.[12] Harris Dep. at 73:1-12. Thus, using pinhole acuity, Melber's vision went from 20/200 on July 20 to 20/400 on August 3. This is a relatively slight decrease that amounts to about a one-line difference on the standard eye chart. Not only was the change in acuity relatively minor but Drs. Bhagat, Lee, and Fineman credibly explained that the epiretinal membrane could account for the drop in uncorrected visual acuity. *See, e.g.*, Tr. Vol 4 at 551:14-20. These medical professionals also testified that the SPK and low pressure could have also caused Melber's decreased uncorrected visual acuity on August 3 but these causes are factored out with the pinhole test. *See* Tr. Vol. 4 at 551:13-17. In sum, the pinhole exam, which tested the visual acuity of the retina, on August 3 showed only a slight drop in Melber's acuity from July 20 to August 3. Moreover, as to the

---

[11] Drs. Fineman, Harrison and Bhagat testified that there was no evidence of macular edema in the VA records. Tr. Vol 4 at 543:25-544:26; Harris Dep. 45:7-11; Tr. Vol. 3 at 298:11-16. And even Dr. Rosenblum himself admitted to the fact that he was speculating that macular edema was present on August 3. Tr. Vol. 2 at 216:21-217:4.

[12] Dr. Harris was not asked to opine on Dr. Lee's treatment on August 3. As a result, he did not discuss Plaintiff's decline in visual acuity between July 20 and August 3.

difference in Melber's uncorrected acuity, the evidence established that there were credible explanations for the drop, that is, the epiretinal membrane, the SPK, and the low eye pressure.

As for Dr. Lee's failure to perform an angiogram or OCT scan, Drs. Bhagat, Lee and Fineman testified that neither test was medically indicated at the time. Tr. Vol. 3 at 295:16-296:6; Tr. Vol. 4 at 511:5-7; 554:18-20. Although Dr. Harris did not specifically comment on the issue, he did state that "[i]f the cornea's too hazy, then neither an OCT scan nor a fluorescein angiogram can be performed." Harris Dep. at 45:12-16. The reason for this is that the physician cannot adequately see into the eye. Even Dr. Rosenblum agreed that these diagnostic tests cannot be performed when the cornea is too hazy. Tr. Vol. 2 at 190:13-15. In addition, had Dr. Lee performed an angiogram or OCT scan because they were medically indicated, *and* macular edema was diagnosed (as Plaintiff assumes), Dr. Lee credibly testified that it would not have changed his course of treatment.[13] Tr. Vol. 4 at 510:17-24. Dr. Lee explained that the low pressure, SPK, and epiretinal membrane reasonably accounted for drop in Melber's uncorrected visual acuity. *Id.* at 467:14-16. In addition, Dr. Lee did take steps to address the low interocular pressure; he discontinued Melber's medication that was designed to lower eye pressure. Drs. Fineman and Bhagat agreed with Dr. Lee's treatment plan on August 3. Tr. Vol. 4 at 555:18-21; Tr. Vol 3 at 296:22-8.

Drs. Bhagat and Fineman further explained that there is no standard time frame in which a large, nuclear RLF must be removed even if macular edema develops. Instead, the timing for removal depends on clinical conditions. For example, if the cornea is hazy then surgery to remove RLF is riskier because the surgeon's ability to see into the eye is limited. *See, e.g.*, Tr. Vol. 3 at

---

[13] Defendant maintains that there was no evidence in the treatment notes of macular edema on August 3. This argument, however, overlooks the critical issue, that is, if Dr. Lee performed either an OCT scan or angiogram, would the test have revealed macular edema?

297:9-18. Whether a patient has undergone multiple surgeries to the eye also impacts the timing decision. Tr. Vol. 4 at 553:18-24. Finally, both Drs. Bhagat and Fineman agreed that RLF must be removed immediately if there is severe inflammation or *high* intraocular pressure that cannot be controlled with medication. Tr. Vol 4 at 543:2-8; Tr. Vol. 3 at 299:1-6. Here, Drs. Bhagat and Fineman indicated that neither condition was present so emergency surgery to remove the RLF was not warranted. Ex. A at 48, Tr. Vol. 4 at 464:18-24. The Court credits the testimony of Drs. Bhagat and Dr. Fineman. Both physicians focus on the posterior of the eye, while Dr. Rosenblum's experience is centered on the anterior of the eye. In other words, Drs. Bhagat and Dr. Fineman are doctors who regularly treat and surgically remove RLF.

Moreover, although Dr. Harris focuses on the posterior of the eye, his deposition testimony is somewhat undercut by his contemporaneous treatment notes. Despite diagnosing Melber with macular edema on August 24, 2009, Dr. Harris did not schedule emergency surgery. Rather, he directed that surgery should be scheduled "as soon as convenient." Ex. G at 713. Critically, on August 24, Dr. Harris recommended a "vitrectomy with the removal of the retained lens nucleus in hopes of eliminating the edema and improving the vision at least somewhat," he also observed that the "amount of visual recovery will be limited due to the fact that the retinal detachment had been present for several weeks prior to its surgical repair." *Id.* Thus, on August 24, Dr. Harris' notes indicated that Melber's recovery was more limited due to the time in between the retina detachment and retina repair surgery rather than from the macular edema caused by the RLF.

During his deposition, Dr. Harris also attributed a great deal of Melber's loss of visual acuity to macular edema. Yet, in his January 14, 2010 notes, Dr. Harris wrote that there was a "mild amount of edema in the macula but this does not appear to be sufficiently severe to explain his level of [visual] acuity loss." Ex. B at 663. Dr. Harris continued that "I think the level of

acuity is more related to the damage from the original detachment." *Id.* Similarly, on August 9, 2010, Dr. Harris noted that there was no macular edema but Melber's corrected visual acuity in the right eye was measured at counting fingers at three feet. Ex. B at 580-82. Thus, even when the macular edema had totally resolved, Melber's visual acuity remained poor. In fact, although the macular edema fluctuated over time, Melber continued to have poor visual acuity. Finally, at times Melber complained of pain or headaches. But macular edema does not cause pain. Harris Dep. at 91:15-24. Rather, Dr. Harris believed that Melber's headaches were either caused by inflammation or trigeminal neuralgia.[14] *Id.* at 87:1-5.

Dr. Harris explained that Melber also developed choroidal neovascularization ("CNVM") in the right eye. CNVM is a collection of abnormal blood vessels in the retina and can lead to permanent vision loss. Macular edema can cause CNVM. *Id.* at 46: 7-9. During his deposition, Dr. Harris opined that the RLF likely caused Melber's macular edema and the macular edema in turn caused the CNVM. *Id.* at 54:1-55:2. Dr. Harris testified that the most common cause of CNVM is macular degeneration (not edema), which is an age-related condition that typically affects both eyes. Because Melber only presented with CNVM in one eye, Dr. Harris attributed the CNVM to the macular edema. *Id.* at 54:3-12. Yet, in his January 1, 2016 notes, Dr. Harris wrote that it "looks like the right eye has developed CNVM related to macular degeneration. This is *unrelated to prior history*."[15] Ex. G at 882 (emphasis added).

---

[14] Trigeminal neuralgia is a chronic pain condition that can cause excruciating pain in the face. *See Trigeminal Neuralgia*, mayoclinic.org, https://www.mayoclinic.org/diseases-conditions/trigeminal-neuralgia/symptoms-causes/syc-20353344 (last visited April 18, 2019).

[15] Dr. Fineman also noted that with respect to the CNVM, Dr. Harris was using the ICD-10 code that is attributed to age-related macular degeneration (not edema). Tr. Vol. 4 at 577:8-25. ICD-10 codes are part of a system used to classify and code diagnoses, symptoms, and procedures.

In sum, even assuming that Plaintiff's case-in-chief established a *prima facie* claim for medical malpractice, the Court alternately finds that Defendant's evidence was more credible that Plaintiff's evidence. As a result, the Court concludes that Plaintiff fails to establish that Dr. Lee deviated from the standard of care and that any deviation proximately caused Plaintiff's injuries.

### 3. Dr. Walsman and Dr. Johnson

As discussed, Plaintiff limited the relevant timeframe of liability to approximately August 3, 2009 to August 23, 2009. During this time frame, Dr. Lee was the only federal employee involved in Plaintiff's care at the VA. Stipulated Facts ¶¶ 16-17. In fact, Dr. Johnson had not seen Melber since May 14, 2009 (*id.* ¶ 8) and Dr. Walsman had not seen Melber since June 19, 2009 (*id.* ¶ 15). Given the fact that Drs. Johnson and Walsman were not involved in Plaintiff's treatment during the critical time period, and Plaintiff provided no evidence as to the improper conduct of either Dr. Walsman or Johnson, the Court also finds in favor of both physician.

### 4. Damages

Plaintiff did not make a claim for lost wages or medical bills. As a result, viewed in a light most favorable to Plaintiff, Plaintiff seeks to recover damages for the difference between visual acuity of approximately 20/150 or slightly better (per Dr. Harris) or 20/200 (per Dr. Rosenblum), and his current condition. All medical professionals recognized that once Melber suffered a macula-off detached retina in his right eye, the visual acuity in this eye would not return to its prior acuity. Accordingly, 20/150 or 20/200 is the best-case scenario for Melber in light of his medical history.

There was little testimony as to the difference between Melber's current condition and his best-case scenario. Dr. Harris opined that the difference between counting fingers and a range of 20/125 or 20/150 was not a significant enough improvement to justify a fourth surgery for Melber

in 2014 to remove the epiretinal membrane. Harris Dep. at 104:1-11. Dr. Harris also explained that for someone with "a normal fellow eye,"[16] the difference between 20/150 and 20/800 would not be dramatic. *Id.* at 115:6-13. Dr. Harris stated that in this situation, the person should be able to rely on the good eye for reading, driving, and watching television. Consequently, Dr. Harris believed that the loss of visual acuity in one eye would not "change the quality of [] life dramatically." *Id.* at 115:115:12-13. However, Dr. Harris explained that depth perception could be an issue, so a person with poor vision in one eye would need "a little extra care" when walking up steps or judging distances. *Id.* at 117:11-13.

Dr. Fineman testified that he did not see any reason why the loss of vision in Melber's right eye prevented him from participating in normal, daily activities like driving, household chores, and walking up and down stairs. Dr. Fineman explained that although it would take about six months to a year to adapt, a person only needs one eye to do most activities; the fellow good eye will take over for central vision. Tr. Vol. 4 at 582:1-583:4.

Plaintiff's characterization of his injuries and the limitations he faces is not in accord with Drs. Harris and Fineman's testimony. Plaintiff stated that his current quality of life is "horrible." Tr. Vol 1 at 50:18-20. Plaintiff relies on his adult-son Michael to walk up stairs, go grocery shopping, take him to doctor's appointments, and for help with house chores. Michael, who lives with Plaintiff, cooks, cleans, does the laundry, and mows the lawn. Moreover, Plaintiff does not leave the house without his son and no longer drives. *Id.* at 51:1-25. Plaintiff also has poor depth perception and has fallen twice. *Id.* at 51:25-527. Finally, Plaintiff states that sunlight blinds him, and car lights bother his eyes at night. *Id.* at 52:8-12. Plaintiff, however, was asked to compare his current condition with his life before his detached retina, when his vision was 20/20 in the right

---

[16] The "fellow" eye refers to the other eye. Here the fellow eye is Melber's left eye.

eye. *Id.* at 50:18-19. As discussed, because of the retinal detachment, this is an inaccurate comparison. This is also the case for Michael's testimony. Michael testified as to the difference between his father before the detached retina and today. *Id.* at 121:9-16. Again, the relevant point of comparison is the best-case scenario for Plaintiff's vision after the retinal surgery in May 2009 to his present visual acuity.

Plaintiff also has numerous comorbidities. While not an exhaustive list, Melber has had a hernia; has degenerative joint disease; has peripheral sensory neuropathy; has had numerous surgeries, including open heart surgery; and has trigeminal neuralgia, which can cause pain in his eyes. Tr. *Id.* at 99:16-103:2. Due to his multiple health conditions, Plaintiff takes a variety of medications, including Vicodin, oxycodone, and Tylenol with codeine. *Id.* at 104:23-107:7. The trigeminal neuralgia could account for some of the pain in Plaintiff's eye, but Plaintiff offered no proof to distinguish that condition from the alleged injuries in this case. Moreover, certain comorbidities – such as the degenerative joint disease and the peripheral sensory neuropathy – could certainly affect Plaintiff's current quality of life. Plaintiff made no effort to differentiate between the loss of vision in his right eye and his other conditions when describing his current quality of life. Moreover, it appears that Plaintiff's use of pain medication preceded 2009 by a number of years. Again, Plaintiff did not differentiate between the pain he felt before August 2009 and after.

Finally, Melber also testified about eye pain that he incurred after the May retinal surgery. This pain is not relevant as Plaintiff's case is limited to his treatment at the VA with respect to removal of the RLF after his cataract surgery. In addition, per Dr. Rosenblum's testimony, Plaintiff's claims are even further limited to around August 3, 2009 and thereafter. Accordingly,

Melber is limited to pain and suffering that he suffered from August 3 onwards. But, according to Dr. Harris, macular edema does not cause pain.[17] Harris Dep. at 91:15-24.

The Court does not doubt that a person suffers some form of legal damages if his eyesight in a single eye is reduced from 20/150 or 20/200 to permanent loss of central vision. The difficulty is that Plaintiff has the burden of proving the extent of his damages, and here Plaintiff's proofs fall short. First, Plaintiff and his son focused on the difference between Plaintiff's vision before the retinal detachment and his vision after. But as discussed, this is not an appropriate comparison. Second, Dr. Fineman testified that when a person loses vision in one eye, that person can usually resume most normal activities within a year if the fellow eye has good vision. Dr. Harris similarly explained that such a person should be able to perform many daily tasks. To this end, certain activities that Melber claims he can no longer perform, such as cleaning or cooking, do not seem attributable to the loss of vision in his right eye. As a result, the Court concludes that Plaintiff fails to adequately establish the extent of his damages. The Court is, in essence, left to speculate as to the degree of Plaintiff's damages. Although the Court finds that Plaintiff fails to meet his burden in proving liability, the Court also determines that Plaintiff's proofs as to the extent of his damages are lacking.

---

[17] The evidence at trial also suggests that Melber did not take certain reasonable steps to aid his condition. For example, Melber did not fill a prescription that Dr. Harris prescribed (Tr. Vol. 1 at 91:14-92:3), there is an approximately two-year lapse in treatment with Dr. Harris (Harris Dep. 2 at 39:7-40:13), and when Melber obtained a second opinion while treating with Dr. Harris, Melber did not tell Dr. Harris that he had obtained the second opinion or that the second doctor recommended two additional surgeries that Melber opted not to receive (Tr. Vol. 1 at 96:4-16). There is insufficient evidence demonstrating that any of these examples may have impacted the visual acuity in Plaintiff's right eye. As a result, the Court will not consider this evidence in assessing damages or as to comparative negligence.

### III. CONCLUSION

For the reasons stated above, the Court enters judgment in favor of Defendant. An appropriate Order and Judgment will accompany this opinion.

Dated:      April 23, 2019

JOHN MICHAEL VAZQUEZ, U.S.D.J.